UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>      Plaintiff,<br><br>v.<br><br>BNSF RAILWAY COMPANY,<br><br>      Defendant. | Case #:<br><br>Judge: |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1. Plaintiff, the Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters ("BMWED") files this complaint against Defendant BNSF Railway Company ("Carrier" or "BNSF") on behalf of itself and employees of the Carrier whom BMWED represents under the Railway Labor Act ("RLA").

2. BNSF unilaterally changed the rules and working conditions of employees represented by BMWED when it disregarded the clear and unambiguous language of the parties' collective bargaining agreement ("CBA") that requires the Carrier to award vacancies to employees based on seniority and requires the Carrier to allow senior employees to displace junior employees.

3. The CBA requires BNSF to award permanent and seasonal vacancies "to the senior applicant who holds seniority in the seniority roster from which the position in question is filled." Likewise, the CBA requires BNSF to fill temporary vacancies "by assigning employees in seniority order who have a request on file to fill such service…"

1

4. The CBA also requires BNSF to allow an employee whose permanent position was abolished to "displace any junior employee… in any group in which he holds seniority."

5. Instead of awarding permanent, seasonal, and temporary vacancies to employees based on seniority, in January 2025, for the first time, BNSF began requiring employees to have certain prerequisites that they called "qualifications" in order to be awarded a position.

6. And instead of allowing senior employees whose permanent positions were abolished to displace any junior employee in the group in which they hold seniority, BNSF began requiring senior employees to have the prerequisite "qualifications" to displace a junior employee.

7. BNSF took these actions despite the clear seniority language in the CBA and without having engaged in and exhausted the RLA's required bargaining procedures.

8. BMWED seeks declaratory and injunctive relief against BNSF for unilaterally imposing new terms and conditions of employment upon its BMWED-represented employees and to remedy its unlawful alteration of the RLA's status quo requirement.

## JURISDICTION AND VENUE

9. This case arises under the RLA, 45 U.S.C. §§ 151 *et seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Therefore, this Court has federal question jurisdiction under 28 U.S.C. § 1331. This Court also has jurisdiction under 28 U.S.C. § 1337, as this is an action arising under a statute that regulates commerce and/or protects trade and commerce against restraints.

10. The Norris-LaGuardia Act, 29 U.S.C. § 101, *et seq.*, does not deprive this Court of jurisdiction over BMWED's claims for injunctive relief because this action is brought to enforce the mandatory procedures of the RLA, 45 U.S.C. § 151, *et seq.*

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b) and (c) because BNSF operates through this judicial district and division.

## PARTIES

12. Plaintiff BMWED is a national labor organization and a duly authorized bargaining representative under the RLA for persons employed by the Carrier. BMWED is a "representative" as defined in 45 U.S.C. § 151, Sixth. Its principal place of business is in Novi, Michigan.

13. Defendant BNSF is incorporated in Delaware and headquartered in Fort Worth, Texas. BNSF is a freight railroad that operates a rail transportation system in 28 states and is a "carrier" within the meaning of the RLA, Section 1, First, 45 U.S.C. § 151, First. BNSF conducts significant rail operations within this judicial district.

## STATEMENT OF FACTS

### Background

14. BMWED has been the exclusive collective bargaining representative under the RLA for maintenance of way employees of Montana Rail Link, Inc. ("MRL") since 1987. Under the RLA, collective bargaining agreements do not expire; they become amendable. There are several agreements that are part of the collective bargaining agreement (collectively referred to as the "CBA") between the parties. A copy of the most recent Master Agreement between MRL, BMWED, and other unions representing different crafts is attached as **Exhibit A**, which was amended and effective as of March 24, 2022.

15. MRL, BMWED, and other unions representing different crafts are also parties to an agreement called the Quality of Work Life Agreement, effective as of March 24, 2022. The Quality of Work Life Agreement is attached as **Exhibit B**.

16. Additionally, each of the unions that represent different crafts of employees have their own craft specific provisions agreements. BMWED's Craft Specific Provisions Agreement with MRL, effective as of March 24, 2022, is attached as **Exhibit C.**

17. On August 15, 2022, BNSF and BMWED signed an agreement ("Implementing Agreement") in anticipation of the Surface Transportation Board authorizing MRL to discontinue its lease of rail lines and for BNSF to assume operation over those rail lines. The Implementing Agreement provided for a new seniority district within BNSF called the MRL Subdivision. BNSF agreed to be bound by the terms of the CBA between MRL and its employees represented by BMWED and other unions. The Implementing Agreement is attached as **Exhibit D**.

18. On January 1, 2024, pursuant to authority granted by the Surface Transportation Board, MRL discontinued all active rail operations. BNSF assumed operations across the former MRL lines on the newly-designated MRL Subdivision of the Montana Division of BNSF.

Seniority Rules under the CBA

19. Under the CBA, positions are to be awarded to employees based strictly on seniority.

20. Article 4(B) of the Master Agreement states: "The right to work positions and assignments shall be governed by seniority." Exhibit A, at 5.

21. Pursuant to Rule A-1(B) of the BMWED Craft Specific Provisions Agreement, the Carrier is required to maintain separate seniority rosters for each group within each sub-department as defined in the Agreement. Exhibit C, at 1.

22. Pursuant to Rule A-2(A), all positions and vacancies are classified as follows:

1. Temporary positions are positions and vacancies of less than thirty (30) calendar days, including vacancies pending bulletin, as well as flex time relief positions.

4

    2. Seasonal positions are positions or vacancies of thirty (30) calendar days or more, but of eleven (11) months or less duration.
    3. Permanent positions are positions or vacancies of eleven (11) months or more duration.

Exhibit C, at 5.

23.    Rule A-2(B) requires the Carrier to promptly bulletin all seasonal and permanent vacancies. The rule further requires each bulletin to show the consecutive number, date of issue, date of expiration, title of position, whether seasonal or permanent, headquarters and current rate of pay, assigned hours, meal period, and work and rest days. Exhibit C, at 5.

24.    Rule A-2(E) specifies when the bulletins must be posted, closed, and awarded. Exhibit C, at 6.

25.    Rule A-2(F) details how employees apply for vacancies during the bulletin period. Exhibit C, at 6.

26.    Rule A-2(H) requires the Carrier to assign vacancies based on seniority: "Each new position or vacancy bulletined <u>will be assigned to the senior applicant</u> who holds seniority in the seniority roster from which the position in question is filled." Exhibit C, at 6 (emphasis added).

27.    Rule A-2(I) further specifies that "[p]ositions or vacancies bulletined pursuant to Paragraph B <u>will be awarded to the senior applicant</u> within the time limits described in Paragraph E." Exhibit C, at 6 (emphasis added).

28.    In sum, the CBA requires the Carrier to bulletin seasonal and permanent vacancies in a specific manner. It details how employees are to apply for such vacancies, and then it requires the Carrier to award those vacancies to the senior applicant who applies.

29.    The CBA does not permit the Carrier to condition a seasonal or permanent job award on anything except seniority.

5

30. Rules A-3, A-4, and A-5 of the Craft Specific Provisions Agreement detail the policies and procedures related to temporary vacancies. Exhibit C, at 8-13.

31. Rule A-3 provides the procedures for employees who want to transfer to temporary vacancies. Exhibit C, at 8-9.

32. Rule A-3(B) states in part: "Employees in active service who have filed written request to fill temporary positions <u>shall be transferred</u> to available temporary positions <u>in seniority order</u> for this service." Exhibit C, at 9 (emphasis added).

33. Rule A-4 provides the procedures for furloughed employees to fill temporary vacancies from a call list maintained by the Carrier. Exhibit C, at 9-10.

34. Rule A-4(A) states in part: "Requests made under this rule shall be combined in dovetail fashion based on seniority with requests submitted pursuant to Rule A-3, and employees <u>will be called in seniority order</u> in each respective group from the combined list." Exhibit C, at 9-10 (emphasis added).

35. Rule A-5 provides further details about filling temporary vacancies. Exhibit C, at 10-13.

36. Rule A-5(A) states in part: "When temporary vacancies or positions of less than thirty (30) days but more than five (5) days are filled, they <u>will be filled by assigning employees in seniority order</u> who have a request on file to fill such service per Rule A-3 (transfer list) or Rule A-4 (call list)." Exhibit C, at 10 (emphasis added).

37. In sum, the CBA details the procedures employees must follow to apply for temporary vacancies. If employees have a request on file to fill a temporary vacancy, the CBA mandates that such vacancies will be filled in seniority order.

38. Under the clear and unambiguous language of the CBA, temporary, seasonal, and permanent vacancies must be awarded to the senior applicant, and the CBA does not permit the Carrier to condition the job awards on anything besides seniority.

39. The Craft Specific Provisions Agreement also requires the Carrier to allow senior employees to displace junior employees.

40. Rule A-6 (D) of the Craft Specific Provisions Agreement states that: "If an employee's permanent position is abolished or he is displaced by a senior employee, he may at his option: 1) Displace any junior employee assigned on a permanent, seasonal, temporary or recalled basis in any group in which he holds seniority. 2) Or accept furlough status per Article J of the Quality of Work Life Agreement." Exhibit C, at 14.

41. In other words, if a senior employee's position is abolished, he is permitted to displace <u>any</u> junior employee in any group in which he holds seniority. The CBA does not permit the Carrier to condition the displacement.

<u>Qualifying for a Position</u>

42. In addition to the seniority language referenced above, the CBA expressly anticipates that employees will be awarded positions <u>before</u> becoming "qualified" for that position.

43. Per Rule A-2(Q) of the Craft Specific Provisions Agreement, after an employee bids into a new position, the employee is deemed "qualified" in that position after working in the position for 30 days. Exhibit C, at 8.

44. The qualification period is essentially the length of time that an employee is given to learn the job that they were awarded pursuant to seniority rules.

45. If an employee lacks the ability to perform the job, the Carrier may disqualify the employee from the position during the qualification period, but the employee must be given a reasonable opportunity to qualify for the job.

46. Rule A-2(P) states, "Employees will be given cooperation by the Company and reasonable opportunity in qualifying for positions <u>secured in the exercise of seniority</u>. When new jobs are created or vacancies occur in the respective ranks or rosters, the senior employee applying shall be given preference in filling such new positions and vacancies in the applicable seniority rank or roster." Exhibit C, at 7-8 (emphasis added).

47. Rule A-1(E) addresses when employees are disqualified from positions "for lack of ability to do such work within the first thirty (30) working days." The rule states that such circumstance will be subject to Article G and H of Attachment "A" to the Craft Specific Provisions Agreement and Article H of the Quality of Work Life Agreement. Exhibit C, at 4.

48. Article G of Attachment "A" notes that it is understood and agreed that employees assigned to temporary positions "shall have such time count toward their thirty (30) day qualification period, provided such time is served in blocks consisting of a minimum of five (5) consecutive work days." Exhibit C, at 30.

49. Article H of Attachment "A" details what will occur when an employee is disqualified pursuant to the agreement. Such employee "will be restricted from bidding back to the same position from which just disqualified, for a period of six (6) calendar months (disqualified period)." Article H further details what will occur if an employee is disqualified from the same position more than once. It also notes that "[t]he disqualification period shall not be applicable in the case where an employee may be able to become qualified such as through additional formal training or obtaining a required certificate, license, etc." Exhibit C, at 30.

50. Article H of the Quality of Work Life Agreement further details disqualification. Article H(1) states:

> "Employees will be given cooperation by the Company and reasonable opportunity in qualifying for positions secured in the exercise of seniority. Employees awarded bulletined positions or employees securing positions through the exercise of seniority to a position for which not yet qualified may be disqualified for lack of ability to do such work during the first thirty (30) working days thereon. Employees will not be disqualified for lack of ability to do such work after a period of thirty (30) working days thereon."

Exhibit B, at 7.

51. Article H(2) of the Quality of Work Life Agreement states: "An employee failing to qualify for a position <u>secured by bulletin or in exercise of seniority</u> will be given notice in writing of reason for such disqualification within two (2) working days of the disqualification." Exhibit B, at 8 (emphasis added).

52. In other words, positions are to be awarded strictly by seniority, regardless of whether they are "qualified." <u>After</u> an employee is awarded the position, the qualification period is 30 working days. During those 30 days, the Carrier is required to give the employee a reasonable opportunity to qualify for the position, but an employee could be disqualified for lack of ability to do the job.

Prerequisites for Certain Positions

53. When an employee is required to have certain experience or possess a certain license to acquire a position, it is detailed in the Craft Specific Provisions Agreement.

54. For example, Paragraph 6 of Attachment C to the Craft Specific Provisions Agreement states that "[w]hen a position of Lowboy Operator is advertised, all applicants must possess the appropriate CDL/DOT license and required endorsements prior to the advertising bulletin closing date or the applicant's bid will not be considered. The applicant must also possess

9

prior Truck Driver or Machine Operator experience, demonstrated by having previously worked such position(s), prior to the bulletin closing." Exhibit C, at 35.

55. For some positions, a CDL license is required within a bid cycle, but employees are permitted to apply with a CDL learners permit. Rule A-2(R) states in part: "Employees may request Foreman/Welders/Grinders position with a written CDL learners permit and must obtain CDL within a bid cycle. Can be extended mutually by agreement in bid cycle increments." Exhibit C, at 8.

56. In sum, when an employee must have certain prerequisites to apply for a position, the prerequisites are detailed in the CBA.

57. Prior to January 2025, BNSF (and formerly MRL) followed the clear language of the CBA, awarding bids by seniority, and only requiring a CDL license or CDL learners permit as prerequisites for certain positions in the bulletins. For example, bulletins from December 6, 2024 are attached as **Exhibit E**, and bulletins from December 3, 2023 are attached as **Exhibit F**.

BNSF Unilaterally Begins Requiring New Prerequisites for Positions

58. In January 2025, BNSF began requiring employees to possess certain prerequisites (that the Carrier has called "qualifications") not detailed in the CBA as new conditions to being awarded bids or assigned temporary vacancies.

59. These "qualifications" created by the Carrier can be earned by completing specific trainings.

60. For example, "CR1" is a "qualification" created by BNSF. An employee can earn the CR1 qualification by completing the tier one crane operator training, which is a web-based training. The "CR2" qualification can be earned by completing the crane core training, which is only available at the Carrier's Technical Training Center in Kansas City, MO. The "SSCO"

10

qualification is earned by completing the speed swing crane course, which is likewise only available the Technical Training Center in Kansas City, MO.

61. The Carrier created over 40 "qualifications" that are only granted to employees after they complete specific trainings.

62. On January 3, 2025, bulletins for seasonal and permanent positions and the transfer list for temporary positions began listing these "qualifications" that employees were required to obtain prior to bid assignment for the first time. The bids posted by the Carrier are attached as **Exhibit G**.

63. Instead of awarding positions based strictly on seniority, as required by the CBA, the Carrier began awarding positions based who had the newly created "qualifications."

64. For example, on January 8, 2025, employee Jake Firestone applied for a temporary speed swing position pursuant to Rule A-3. The email confirming his submission is attached as **Exhibit H.**

65. Shortly thereafter, he sent an email to BNSF Analyst Labor Relations, Tiffany Crawford, to confirm that he was allowed to apply for the temporary position pursuant to Rule A-3 regardless of the new prerequisites the Carrier was requiring. Again, Rule A-3 states, in part, that "[e]mployees in active service who have filed written request to fill temporary positions shall be transferred to available temporary positions in seniority order for this service." Exhibit C, at 9. Ms. Crawford responded and stated: "No, you must have the required qualifications to be assigned. You are missing CR1, CR2, and SSCO qualifications." The email correspondence is attached as **Exhibit I.**

66. Mr. Firestone should have been awarded the temporary speed swing position based on his seniority. Instead, the Carrier conditioned the award on prerequisites that are not detailed in the CBA, failing to award the position based on seniority.

67. On January 16, 2025, BNSF sent an email to employees "to help you ensure you have the required qualifications to make applications to positions you wish to work." The email is attached as **Exhibit J.** Two documents were attached to the email.

68. The first document specified which "qualifications" an employee was required to possess for certain positions prior to assignment and which "qualifications" must be obtained after being awarded a bid. The document is attached as **Exhibit K.**

69. The second document gave descriptions of the "qualifications" and their delivery methods. The document is attached as **Exhibit L.**

70. On February 16, 2025, employee Robert Morrison submitted a bid for Welder Foreman. The email confirming Mr. Morrison's bid is attached as **Exhibit M.** As the senior employee who submitted a bid, Mr. Morrison should have been assigned the position, but because he did not possess the new, unilaterally required prerequisite "qualifications," he was not awarded the position, and it went unfilled.

71. On or about February 28, 2025, employee Jeremiah Berry's position was abolished. Despite language in the CBA that permits him to displace "any junior employee…in any group in which he holds seniority," Mr. Berry was told by Ms. Crawford that he was "not qualified" to bump junior employees in positions such as the locomotive crane operator, foreman, welding foreman, and welder, despite holding seniority in those groups.

72. On or about March 23, 2025, employee Nick Piper bid on a speed swing position. However, a junior employee, Levi Vick, was awarded the position. The seniority roster showing

Mr. Piper listed as #157 on the Machine Operator I Roster and Mr. Vick listed as #207 is attached as **Exhibit N**.

73. On March 24, 2025, Mr. Piper sent an email to Ms. Crawford asking why a junior employee was awarded the position over him. Ms. Crawford responded, stating that Mr. Piper did not have all of the newly required "qualifications" at bid closing, while the junior employee did. The email exchange is attached as **Exhibit O**.

74. On March 24, 2025, employee Jordan Lapierre submitted a bid using an A-3 request and listed the Welder Foreman position as his first choice. The email confirming Mr. Lapierre's bid is attached as **Exhibit P**. Mr. Lapierre is on the Welder Foreman seniority roster (**Exhibit Q)**, yet he was not awarded the Welder Foreman position, and it remained vacant. Instead, he was awarded a Laborer position. The email from Ms. Crawford awarding him the Laborer position is attached as **Exhibit R.**

75. Since January, BNSF has continued to include prerequisite "qualifications" on job bulletins. The job bulletins for February, March, April, May and June 2025 are attached as **Exhibit S**.

76. In sum, the CBA details the specific procedures the Carrier must follow to post temporary, seasonal, and permanent vacancies. It also details how employees should apply to those vacancies. If the employee follows those procedures, the Carrier is required by multiple provisions in the CBA to award positions based on seniority. <u>After</u> an employee is awarded a position, the CBA requires the Carrier to give the employee a reasonable opportunity to become "qualified" within the next 30 days. If the employee is unable to do the job, he may be disqualified within those 30 days.

77. However, instead of awarding positions to employees by seniority and giving them an opportunity to become qualified, as required by the clear and unambiguous language of the CBA, BNSF has been awarding positions based on the newly required prerequisite "qualifications" that are not detailed in the CBA.

78. Additionally, if an employee's position is abolished, the CBA requires the Carrier to permit that employee to displace any junior employee in any group in which he holds seniority. The CBA does not permit the Carrier to condition the displacement on anything besides a CDL license or CDL learners permit for some positions.

79. However, instead of permitting a senior employee to displace junior employee in groups in which he holds seniority, the Carrier conditioned displacement on whether the employee had the new "qualifications."

80. BNSF did not negotiate these changes with BMWED but instead implemented them unilaterally.

81. Despite attempts by BMWED to resolve the dispute without litigation, BNSF has continued to directly contradict the unambiguous language of CBA by refusing to fill vacancies based on seniority and by not allowing senior employees to displace junior employees.

82. Through its actions, BNSF has unlawfully circumvented its RLA-mandated status quo and bargaining obligations.

**FIRST CAUSE OF ACTION**
*Violation of RLA Sections 6 and 2, Seventh, 45 U.S.C. §§ 156, 152, Seventh*

83. BMWED incorporates by reference the allegations in the preceding paragraphs.

84. Section 2, Seventh of the RLA provides: "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in

agreements except in the manner prescribed in such agreements or in section 156 of this title." 45 U.S.C. § 152, Seventh.

85. Section 6 of the RLA, 45 U.S.C. § 156, provides that carriers and representatives must give at least 30 days written notice of any intended changes to a collective bargaining agreement.

86. BNSF has not served BMWED with a notice of intended change in their agreements affecting rates of pay, rules, or working conditions as required by Section 6 of the RLA.

87. By requiring employees to possess certain "qualifications" prior to assignment of the position through bid or displacement, BNSF has unilaterally changed the rates of pay, rules, and working conditions of its employees.

88. Because BNSF unilaterally implemented this change without resorting to the procedures set forth in RLA § 156, the Carrier has violated Sections 6 and 2, Seventh of the RLA. 45 U.S.C. §§ 156, 152, Seventh.

**SECOND CAUSE OF ACTION**
*Violation of RLA Section 2, First, 45 U.S.C. § 152, First*

89. BMWED incorporates by reference the allegations in the preceding paragraphs.

90. Section 2, First of the RLA, 45 U.S.C. § 152, First, provides: "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption of commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

91. By unilaterally requiring employees to possess certain "qualifications" prior to assignment of a position or displacing a junior employee, and refusing to suspend this unilaterally

imposed practice, BNSF has failed to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions and has violated Section 2, First of the RLA, 45 U.S.C. § 152, First.

### THIRD CAUSE OF ACTION
*Declaratory Judgment Act*

92. BMWED incorporates by reference the allegations in the preceding paragraphs.

93. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, BMWED is entitled to a declaration as to the parties' rights and obligations under the RLA.

94. BMWED is entitled to such a declaration because the instant dispute is an actual and existing controversy.

### PRAYER FOR RELIEF

WHEREFORE, BMWED respectfully requests that this Court:

A. Issue a Declaratory Judgment that BNSF's actions unlawfully changed the rates of pay, rules, or working conditions of its employees and violated the Carrier's obligations under the RLA;

B. Issue injunctive relief enjoining Defendant BNSF from requiring employees to have prerequisite "qualifications" to fill seasonal, permanent, and temporary positions or displace junior employees unless and until the parties have exhausted the processes outlined in the RLA Section 6;

C. Award BMWED its costs and attorney's fees incurred is this proceeding; and

D. Issue any other relief this Court deems just and proper.

**DATED:** August 1, 2025

Respectfully submitted,

*/s/ Rachel R. Rekowski*

Rachel R. Rekowski (OH Bar # 102247)
Pamela M. Newport (OH Bar # 79427)
HERZFELD, SUETHOLZ, GASTEL,
LENISKI & WALL, PLLC
600 Vine St., Suite 2720
Cincinnati, OH 45202
Telephone: (513) 381-2224
rachel@hsglawgroup.com
pamela@hsglawgroup.com

***Counsel for Petitioner, Brotherhood of Maintenance of Way Employes Division of The International Brotherhood of Teamsters***