IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 25 C 9121 |
| v. | ) ) | Judge Jorge L. Alonso |
| BNSF Railway Company, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff alleges that Defendant BNSF Railway made unilateral changes to the parties' Collective Bargaining Agreement ("CBA") in violation of the Railway Labor Act ("RLA"). Defendant moves to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. For the reasons stated below, Defendants' motion is granted.

**Background**

Maintenance-of-way employees are responsible for building and repairing train tracks. R. 14 at 9. Plaintiff has been the exclusive collective bargaining representative for maintenance-of-way employees of Montana Rail Link ("MRL") since 1987. R. 1 ¶ 14. Prior to 2024, MRL leased and operated certain rail lines in Montana. *See id.* ¶ 17. In January 2024, MRL discontinued its rail operations and BNSF assumed operations on all former MRL rail lines as part of a new MRL Subdivision of BNSF. *Id.* ¶ 18. As part of this transition, BNSF agreed to be bound by the CBA, which had been previously entered into between Plaintiff and MRL. *Id.* ¶ 17. The CBA incorporates the following documents: the Master Agreement (R. 1-1), the Quality of Work Agreement (R. 1-2), and the Craft Specific Provisions Agreement (R. 1-3). R. 1 ¶¶ 14–16.

As relevant, the CBA provides maintenance-of-way employees of the MRL Subdivision with certain "seniority rights." R. 1-1 at 7. Specifically, the CBA provides that the "right to work positions and assignments shall be governed by seniority." *Id*. The CBA also sets forth a process under which BNSF is required to bulletin job vacancies and under which employees apply for vacancies. R. 1-3 at 8–11. Under this process, "[e]ach new position or vacancy bulletined will be assigned to the senior applicant who holds seniority in the seniority roster from which the position in question is filled." *Id.* at 9.

The CBA defines the different job positions available for maintenance-of-way employees. R. 1-3 at 25–29. For most positions, the CBA provides that the employee must be "qualified" to perform the work, but does not enumerate specific requirements. *Id.* For example, a "Track Laborer" is "[a]n employee qualified to perform all work in connection with the construction, maintenance or dismantling of roadway and track, and all other work incident thereto." *Id.* at 26. But for certain positions, the CBA does enumerate specific requirements. *Id.* at 25–29. For example, a "Track Truck Driver" is "[a]n employee qualified and assigned to operate trucks over 22,000 pounds GVW . . . [and] must have a commercial driver's license." *Id.* at 25.

After the MRL transition, BNSF created over forty new "qualifications" which are granted to employees only after they complete specific training sessions. R. 1 ¶ 61. Then, starting in 2025, BNSF required that employees obtain certain of these new "qualifications" prior to bidding on certain job positions. *Id.* ¶ 62. Plaintiff then filed this complaint, contending that BNSF violated the CBA (and in turn the RLA) because "[i]nstead of awarding positions based strictly on seniority, as required by the CBA, [BNSF] began awarding positions based [on] who had the newly created 'qualifications.'" *Id.* ¶ 62. BNSF now moves to dismiss for lack of subject matter jurisdiction, arguing that this dispute is subject to binding arbitration under the RLA. R. 14.

**Discussion**

I. **The Railway Labor Act**

The RLA governs "the relationship between employees and employers in the railroad industry." *BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 412 (7th Cir. 2021). To modify the "rates of pay, rules, or working conditions of [its] employees," a railroad must either "act in accordance with any existing agreement" or "go through the bargaining and negotiation procedures prescribed in the RLA." *Id.* (citations omitted). When disagreements arise over whether a railroad acted in accordance with an agreement, "the RLA draws a line between two classes of disputes . . . [what the] Supreme Court has [called] 'major disputes' and 'minor disputes.'" *Id.* Whether a dispute is major or minor does not relate "to the dispute's relative importance" but rather "turns instead on whether a railroad can point to existing authority to justify its action." *Id.*

A major dispute "arises from the creation of new contracts or modifications of existing contracts that affect any of the mandatory subjects of bargaining established in the RLA" such as rates of pay, rules, or working conditions. *Id.* A minor dispute "arise[s] from the interpretation or application of existing agreements." *Id.* "Put another way, major disputes seek to create contractual rights, [and] minor disputes to enforce them." *Id.* (citations omitted). *See also Brotherhood of Railway, Airline & Steamship Clerks v. Atchison, Topeka & Santa Fe Railway Co.*, 847 F.2d 403, 406 (7th Cir. 1988) ("In essence, a major dispute involves the creation of a contract or a change in the terms of an existing contract, while a minor dispute involves the interpretation or application of an existing contract.").

"Federal courts only have jurisdiction to hear major disputes, [and] minor disputes are resolved in arbitration." *Int'l Bhd. of Teamsters v. Republic Airways Inc.*, 127 F.4th 688, 693–94 (7th Cir. 2025); *see also BLET GCA UP*, 988 F.3d at 412–13 ("When confronted with a major

3

dispute, a court may use its injunctive authority to maintain the status quo while mediation and bargaining occur . . . [b]ut minor disputes must go directly to binding arbitration, typically conducted by the National Railroad Adjustment Board."). The RLA reflects a "strong preference" for arbitration to further its goals "to avoid disruption in labor and to ensure that industry experts interpret and enforce CBAs." *Int'l Bhd. of Teamsters*, 127 F.4th at 694 (citations omitted). An employer's burden to persuade a court that a dispute is minor is thus "quite low" and the employer "need only show that its CBA arguably justifies its conduct." *Id.* (citations omitted). So long as the employer's interpretation of the CBA is "neither obviously insubstantial or frivolous, nor made in bad faith, the court lacks jurisdiction to do anything but dismiss the case and allow arbitration to go forward." *Id.* (citations omitted). When a court decides between major or minor, "there is a large thumb on the scale in favor of minor, and hence arbitration." *Id.* (citations omitted).

## II. Application

BNSF moves to dismiss on the basis that the dispute regarding the over forty new "qualifications" is a minor dispute, subject to binding arbitration and thus that the Court lacks subject matter jurisdiction. R. 14. As discussed above, the dispute is minor so long as the CBA "arguably justifies" BNSF's decision to add the new "qualifications" to the job bulletin. The Court thus turns to the language of the CBA.

To start, the CBA has numerous provisions which clearly protect "seniority rights." Those provisions include the following:

- "Seniority Rights . . . The right to work positions and assignments shall be governed by seniority." R. 1-1 at 7.

- "Each new position or vacancy bulletined will be assigned to the senior applicant who holds seniority in the seniority roster from which the position in question is filled." R. 1-3 at 9.

- "Employees in active service who have filed written request to fill temporary positions shall be transferred to available temporary positions in seniority order for this service." *Id.* at 12.

- "Requests made under this rule shall be combined in dovetail fashion based on seniority with requests submitted pursuant to Rule A-3, and employees will be called in seniority order in each respective group from the combined list." *Id.* at 12–13.

- "When temporary vacancies or positions of less than thirty (30) days but more than five (5) days are filled, they will be filled by assigning employees in seniority order who have a request on file to fill such service." *Id.* at 13.

- "If an employee's permanent position is abolished or he is displaced by a senior employee, he may at his option: 1) Displace any junior employee assigned on a permanent, seasonal, temporary or recalled basis in any group in which he holds seniority [or] 2) [] accept furlough status." *Id.* at 17.

The Court finds that these provisions establish a contractual baseline that job positions should be filled based on seniority.

Critically, however, seniority is not an absolute requirement. As discussed, above, the CBA the CBA enumerates specific requirements for certain positions. R. 1-3 at 25–29. For example, a "Track Truck Driver" must have "a commercial driver's license," a "Trackman" must have "passed the written Track Inspector examination," and a "Lowboy Tractor Trailer Operator" must "have prior demonstrated Truck Driver or Machine Operator experience." *Id.* In other words, per the plain language of the CBA, though BNSF must account for seniority, it may still decline a job position to the most senior employee if the most senior employee has not fulfilled the specific requirements set forth in the CBA. If, for example, the most senior employee bidding to be a Track Truck Driver does not have a commercial driver's license, that employee will not receive the position. BNSF seeks to extend the above principle by declining job positions to senior employees who have not fulfilled the "qualifications" mandated by BNSF (in addition to the requirements mandated by the CBA). The following CBA provisions are relevant to consider this issue.

5

First, the CBA states:

> Employees will be given cooperation by the Company and reasonable opportunity in qualifying for positions secured in the exercise of seniority. Employees awarded bulletined positions or employees securing positions through the exercise of seniority to a position for which not yet qualified may be disqualified for lack of ability to do such work during the first thirty (30) working days thereon. Employees will not be disqualified for lack of ability to do such work after a period of thirty (30) working days thereon.

R. 1-2 at 9. This provision cuts both ways. On one hand, it states that employees will be given "reasonable opportunity in qualifying for positions secured in the exercise of seniority." Certainly, the forty new "qualifications" add an extra burden to qualify for a position. But each "qualification" is granted to any employee who completes the relevant training session. And BNSF clearly posts which "qualifications" are required for each position. *See* R. 1-7 (January 2025 Bulletin, requiring between three and twelve "qualifications" depending on the position). BNSF thus has a non-frivolous and good faith argument that even accounting for the new "qualifications," senior employees still have a "reasonable opportunity" to qualify for the positions because they are aware of the required trainings and have an opportunity to complete them.

On the other hand, the section also states that employees may secure positions through the exercise of seniority even if "not yet qualified" and those employees then have a thirty-day window during which BNSF may remove the employee if the employee "lack[s] the ability" to do the work. Plaintiff thus has a reasonable argument that even where a senior employee is not qualified, he should still be given the position, at least initially.

The Court notes, however, that its role in this case is not to interpret the CBA, or to determine whether Plaintiff's position or BNSF's position is the more reasonable interpretation. Rather, the Court need only consider whether the CBA arguably justifies BNSF's conduct. Though this provision lends itself both ways, it still arguably justifies BNSF's conduct.

6

Second, the CBA states:

> The parties to this Agreement agree that the fundamental objective of the railroad, its management and employees is to provide service to its customers in the most efficient manner. Accordingly, the parties agree that in interpreting and implementing this Agreement, paramount emphasis shall be placed on providing efficient service to customers.

R. 1-1 at 5. This provision emphasizes that the CBA must be "interpret[ed] and implement[ed]" consistent the overriding goal of ensuring efficient customer service. It is difficult to imagine more absolute language than the terms the parties choose for this section: that efficient service is the *fundamental* objective that shall receive *paramount* emphasis. If BNSF were forced to award job positions to unqualified senior employees only to remove them within thirty days, this would create significant inefficiencies. As such, this provision arguably justifies BNSF's conduct.

Finally, the CBA states:

> The management of the business; the operation of the railroad; the right to place into effect any and all changes necessary to effect an efficient operation of the business are vested in the Company, subject to the limitations of the Agreement.

R. 1-1 at 7. BNSF argues that this language provides BNSF with the "managerial prerogative . . . [to] require employees to meet minimum certification and credential requirements as a precursor to the seniority-driven bidding process." R. 14 at 25. The Court finds that this is a justifiable reading of the above provision. The Court emphasizes that it does not find that the "managerial prerogative" *actually* extends that far, but that it *arguably* does. In other words, BNSF is not making an obviously insubstantial or frivolous argument.

For the reasons stated above, the CBA arguably justifies BNSF's conduct. This case thus presents a minor dispute subject to binding arbitration under the RLA. BNSF's motion to dismiss is thus granted.

7

## Conclusion

For the reasons stated above, Defendants' motion [14] to dismiss is granted. Civil case terminated.

**SO ORDERED.**                                                                 **ENTERED: October 29, 2025**

**HON. JORGE L. ALONSO**
**United States District Judge**